1

2

3

4

5

6

7

8

9             IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11 DEBRA L. SCHNEIDER,              )
                                   )
12              Plaintiff,          )
                                   )    No.  CV-04-679-HU
13                                  )
        v.                         )
14                                  )
   JO ANNE B. BARNHART,             )
15 Commissioner, Social Security )      FINDINGS & RECOMMENDATION
   Administration,                 )
16                                  )
                Defendant.          )
17 _____)

18

   Rory Linerud
19 LINERUD LAW FIRM
   P.O. Box 1105
20 Salem, Oregon 97308

21      Attorney for Plaintiff

22 Karin J. Immergut
   UNITED STATES ATTORNEY
23 District of Oregon
   Craig J. Casey
24 ASSISTANT UNITED STATES ATTORNEY
   1000 S.W. Third Avenue, Suite 600
25 Portland, Oregon 97204-2902

26 / / /

27 / / /

28 / / /

   1 - FINDINGS & RECOMMENDATION

David M. Blume
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Social Security Administration
701 S.W. Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Debra Schneider brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on May 15, 2001, alleging an onset date of March 3, 2000. Tr. 58-60, 427-31. Her application was denied initially and on reconsideration. Tr. 38-42, 45-49, 433-37, 439-441.

On October 23, 2003, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 453-91. On December 19, 2003, the ALJ found plaintiff not disabled. Tr. 12-26. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 8-10.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on a left knee injury and mental impairments. Tr. 67, 98. At the time of the October 23, 2003 hearing, plaintiff was twenty-four years old. Tr. 457. She is a high school graduate. Tr. 73, 458. Her past relevant work is as a deli cutter/slicer and cashier checker. Tr. 486.

/ / /

2 - FINDINGS & RECOMMENDATION

I.  Medical Evidence

   A.  Knee Impairment

   The record reveals that plaintiff suffered an on-the-job injury to her left knee in March 2000. Tr. 185-87. Orthopedic specialist Dr. Paul A. Watson was plaintiff's treating physician for this injury. _Id._ Plaintiff initially saw him on March 13, 2000, and reported pain with motion or activity and a significant limp. Tr. 187. On physical examination, Dr. Watson found that she had an antalgic[1] gait, favoring the left side, warmth around the knee joint, and a limited range of motion from 0 degrees extension to 95 degrees flexion. Tr. 186. He found no medial or lateral joint tenderness, but was unable to administer McMurray's test[2] secondary to pain in the medial aspect of the joint. _Id._

   Dr. Watson also found it difficult to test the pivot shift due to medial-sided pain. Tr. 185. X-rays revealed no evidence of fracture or dislocation. _Id._ There was no other evidence of abnormality. _Id._ Dr. Watson diagnosed plaintiff as suffering from a medial collateral ligament (MCL) tear of the left knee. _Id._ He placed her into a "hinged DonJoy brace" to allow her to regain motion, maintain stability, and protect the MCL. _Id._ He instructed her to wear it for six weeks and to see him again in two weeks. _Id._ During this time, he approved her for sedentary work,

---

[1] Antalgic gait means a gait in which the patient experiences pain during the stance phase and thus remains on the painful leg for as short a time as possible. _Taber's Cyclopedic Medical Dictionary_ 806 (Daniel Venes & Clayton L. Thomas, eds., 19th ed. 2001) (hereinafter "Taber's").

[2] McMurray's test is used to detect meniscus injuries. www.fpnotebook.com/ORT97.htm

3 - FINDINGS & RECOMMENDATION

although he noted her report that there was none available at her current employment, and estimated she would be medically stationary in two to three months. Id.

On March 24, 2000, Dr. Watson noted that while plaintiff continued to report significant pain, especially with prolonged walking, it had improved since her last visit. Tr. 184. Her pain was along the medial joint line. Id. She continued to have an antalgic gait favoring the left side and warmth and tenderness around the medial joint line. Id. However, her range of motion had improved. Id. He continued to assess her as having an MCL tear. Id. He ordered her to continue wearing the DonJoy brace and perform range of motion exercises. Id. He noted that if there was no improvement in the next couple of weeks, he would plan for an MRI to rule out a possible medial meniscal tear. Id.

On April 12, 2000, Dr. Watson ordered an MRI. Id. It revealed a small joint effusion, but no ligament or meniscal tear. Tr. 189. On April 24, 2000, Dr. Watson noted that plaintiff continued to report significant pain, especially with prolonged walking and squatting. Tr. 183. She reported that the pain over the MCL region had significantly improved and was nearly gone, but that she continued to have pain over the medial aspect of her kneecap. Id. She had difficulty doing any heavy activities or any prolonged walking or squatting. Id.

On physical examination, Dr. Watson noted her mildly antalgic gait favoring the left side and some tenderness over the medial aspect of the patella. Id. He noted that her MCL tenderness was improving, as was her range of motion. Id. The patella revealed a positive "apprehension sign" and a "mildly positive compression

4 - FINDINGS & RECOMMENDATION

test." Id. He assessed her as having a mostly healed left MCL tear and anterior patellofemoral knee pain, likely secondary to weakness caused by the MCL tear. Id. He gave her significant strengthening exercises for her knee and referred her to physical therapy for patellar stabilization and strengthening exercises. Id. He also continued her on sedentary work with the ability to change positions and predicted she would be medically stationary in two to three more months. Id.

Although Dr. Watson indicated that her next appointment with him would be in four weeks, a chart note entry indicates that plaintiff came into his office on May 8, 2000, complaining of knee pain that interfered with her ability to sleep and requesting pain medication. Id. She was offered Vioxx, but apparently refused any non-steroidal anti-inflammatory drugs. Id.

Plaintiff began physical therapy in early May 2000. Tr. 210-11, 216-21. However, by May 15, 2000, the physical therapist reported that she was not progressing. Tr. 208. He noted that because of her painful limp and compromised weight-bearing status, he put her on "axillary crutches TDWB[.]" Id. The physical therapist suspected that there might be an anterior cruciate ligament (ACL) or MCL tear even though the MRI showed only a MCL injury. Id. The plan was for plaintiff to return to Dr. Watson on May 16, 2000. Id.

On May 16, 2000, Dr. Watson noted that plaintiff continued to report severe pain and that she was having increased difficulty in getting around. Tr. 181. He noted that plaintiff had "placed herself on crutches secondary to pain" and was wearing the brace full time. Id. She reported that the majority of her pain was

5 - FINDINGS & RECOMMENDATION

over the anterior aspect of the knee and the medial joint line. Id.

On physical examination, he noted her antalgic gait, favoring the left side. Id. She was able to put weight on her left knee, but it tended to buckle on her. Id. He found tenderness over the medial aspect of the patella and diffusely around the patella as well over the patellar bone. Id. He noted significant MCL tenderness and medial joint line tenderness. Id. Her range of motion was from 0 degrees to 100 degrees of flexion, with pain at the extremes. Id. Any movement of the patella was severely painful. Id.

Dr. Watson concluded that plaintiff's significant pain increase was unattributable to her MCL tear. Tr. 182. He ordered a bone scan to see if it could detect pain from another portion of the knee joint. Id. If the scan turned out to be negative, he planned to assume that a medial meniscal tear was the main problem and that plaintiff had some anterior patellofemoral pain, both of which he expected were likely to resolve. Id. He prescribed Vicodin for pain. Id.

The June 5, 2000 bone scan revealed mild symmetric degenerative arthritic activity at the tibial fibular articulations and patello-femoral joint spaces, bilaterally. Tr. 188. No bone contusion was noted. Id.

On June 15, 2000, Dr. Watson noted that plaintiff reported improvement in her pain, but continued to experience moderate pain with walking. Tr. 180. She was still wearing the DonJoy brace full time. Id. On physical examination, he noted her ability to put weight on the left knee, but indicated that "it wants to give

6 - FINDINGS & RECOMMENDATION

out on her." Id. He reported tenderness over the medial joint line, medial patella and inferior patella poles, and patellar tendon. Id. He further reported mild MCL tenderness diffusely up and down the MCL region. Id. Her range of motion was improved from 0 degrees to 110 degrees flexion, still with pain at the extremes. Id. Her patellar movement had improved, but she continued to have pain with apprehension and compression tests. Id.

Dr. Watson reported that the bone scan was essentially normal, showing only some mild patellofemoral bilateral changes and some mild tibiofibular bilateral changes in those joints. Id. He assessed plaintiff as having continuing joint line pain following MCL injury and anterior patellofemoral injury of the left knee. Id. His plan was to continue conservative treatment. Id. Plaintiff was receptive to the idea of a cortisone injection. Id. Dr. Watson administered the injection at that point. Id. Plaintiff experienced immediate relief of sixty percent of her pain. Tr. 179-80.

Dr. Watson continued plaintiff's work restrictions of sedentary work with the ability to change positions and the ability to ice her knee for an hour or two every four hours. Tr. 179. She was instructed to continue with activities as tolerated and to continue with range of motion and strengthening exercises for the knee, with crutches as needed. Id. He opined that she would be medically stationary in three or four months. Id.

Dr. Watson next saw plaintiff on July 27, 2000. Tr. 178. She reported continued moderate to severe pain when walking or bearing weight. Id. She still reported pain over the medial and anterior

7 - FINDINGS & RECOMMENDATION

aspect of her knee, mostly over the patellofemoral tendon and the medial joint line, as well as over the MCL. Id.

He found no evidence of warmth or effusion and found continued range of motion from 0 degrees to 110 degrees of flexion with pain at the extremes. Id. She continued to have positive apprehension and compression tests but her patellar tracking was reasonable. Id. Dr. Watson continued to assess plaintiff as having continuing medial and anterior knee pain following MCL injury secondary to her work-related injury. Id. At this point, however, he referred her for a second opinion with Dr. Brick Lantz. Id. Dr. Watson hoped that "someone could shed some light as to why [plaintiff] is having so much pain in her knee this long after an MCL injury." Id. He noted that her MRI and bone scan were negative and that while the cortisone injection relieved approximately fifty-percent of her symptoms, it lasted only a couple of days. Id. He was unsure of what else he could do for her to relieve her symptoms. Id. He noted that she was to remain on a work restriction allowing her to elevate and ice her leg for one to two hours out of every four hours. Id.

Dr. Lantz examined plaintiff on August 16, 2000. Tr. 175. He found her able to bear full weight and having full motion but with some pain at full extension and full flexion. Tr. 175. He further found a positive apprehension sign to the patella and tenderness over the medial and lateral facets of the patella. Id. He also noted tenderness over the medial femoral condyle and midmedial joint line. Id. He found no significant varus or valgus instability and stressing did not cause pain. Tr. 175-76. There was no significant anterior or posterior instability. Tr. 176.

8 - FINDINGS & RECOMMENDATION

McMurray's test at 90 degrees with rotation did not cause any significant pain. Id. She had good distal pulses. Id. Dr. Lantz found it difficult to palpate effusion because of plaintiff's obesity. Id.

Dr. Lantz diagnosed her as having left knee pain, most of it patellofemoral. Tr. 176. He noted that she had some medial joint pain. Id. He indicated that he could not completely rule out some type of chondral injury in the joint or medial joint line. Id.

His recommendation was for continued physical therapy for strengthening and range of motion. Id. He also recommended water therapy, either aerobics, swimming, or walking in the pool. Id. He did not recommend new x-rays or anti-inflammatories because plaintiff was thirteen weeks pregnant. Id. He indicated that post-partum, a "Merchant view," presumably a particular type of x-ray, would be helpful to assess alignment of the patella. Id.

Plaintiff saw Dr. Watson again on October 18, 2000. Tr. 173. Plaintiff still reported pain over the medial aspect of her knee which increased with activity and decreased with rest. Tr. 173. She was able to walk around the house for approximately ten minutes but after that, she had significant pain. Id. She used crutches for any long walk. Id.

Dr. Watson noted that she was able to bear full weight and full range of motion, although she had pain at full flexion and extension. Id. She was tender over the medial joint line. Id. His impression was that she had left knee pain, possibly patellofemoral in origin. Id. He planned to continue her with physical therapy for stretching, strengthening, and range of motion exercises. Id. He noted that she was scheduled for an independent

9 - FINDINGS & RECOMMENDATION

medical examination (IME) on October 28, 2000, and that she should follow up with him in four weeks. Id.

The IME was performed by Dr. James Yarusso on October 28, 2000. Tr. 172. Although his records do not appear in the Administrative Record, Dr. Watson noted in his November 16, 2000 chart note that Dr. Yarusso thought plaintiff had pes anserinus bursitis[3] as a persistent problem and that an injection would significantly improve her symptoms. Id.

In examining plaintiff, Dr. Watson noted plaintiff's significant tenderness over the medial aspect of her knee as well as tenderness over the pes anserinus and in and around her knee cap. Id. She continued to have a positive compression test, positive apprehension test, tenderness over the medial joint line, and no varus/valgus instability. Id.

He administered the injection and plaintiff experienced immediate relief of approximately thirty percent of her symptoms and a decrease in tenderness to palpation. Id. She continued to have significant symptoms in the medial aspect of the knee joint and around the knee cap. Id.

He planned to have her continue with physical therapy for stretching and strengthening. Id. Plaintiff remained on a work restriction of sedentary work with the ability to change positions. Id.

Plaintiff resumed physical therapy in November 2000. Tr. 197-204. She was seen approximately twice per week from November 20,

---

[3] Pes anserinus bursitis is the inflammation of the tocias bursa located over the medial side of the tibia just below the knee. Taber's 299, 1564.

10 - FINDINGS & RECOMMENDATION

2000 to December 14, 2000.  Tr. 194-96.  On December 15, 2000, Dr. Watson noted that plaintiff still had tenderness over the medial aspect of her knee, but it was mild.  Tr. 171.  She had good range of motion, negative compression test, and negative apprehension test.  Id.  She had diffuse tenderness about the knee, but also over the pes anserine bursa.  Id.  He assessed her as having improved knee pain, secondary to pes anserine bursitis or chondromalacia of the patella.[4]

He stated that she should continue with physical therapy for strengthening and stretching exercises.  Id.  He also stated that she should continue on a sit-down job only, with sedentary work and the ability to change position.  Id.  He stated that he would declare her medically stationary in one month.  He also stated that he would like to obtain a work capacity evaluation for plaintiff, to further evaluate her final disability rating.  Tr. 170.  He explained that because she had been having problems for a long time and did not seem to be improving appropriately, such an evaluation would help him decide what her final restrictions would be.  Id.

On December 27, 2000, the physical therapist discharged plaintiff for failure to improve.  Tr. 193.  In his discharge summary, he noted that she still presented with functional instability, specifically the inability to weight bear on the left knee in a normal manner and with normal control.  Id.  Although the physical therapist was able to get plaintiff to progress to a single forearm crutch, he was unable to get her to the point of

---

[4] Chondromalica of the patella is a softening and degeneration of the cartilage underneath the kneecap. www.nlm.nih.gov/medlineplus/ency/article/000452.htm#Definition

11 - FINDINGS & RECOMMENDATION

using a cane.  Id.

The physical therapist indicated that one factor that impeded her progress was that she was seven months pregnant at that time. Id.  However, he also indicated that she has a "definite psychosomatic overlay with a fear factor[.]"  Id.

Also on December 27, 2000, on the physical therapist's recommendation, Dr. Watson requested that plaintiff's insurance carrier authorize the purchase of an "off-the-shelf ACL brace" which could improve her leg function.  Tr. 169.  Plaintiff's next appointment with Dr. Watson was rescheduled until January 29, 2001, to occur after her January 19, 2001 physical capacities evaluation. Id.  On January 22, 2001, a chart note indicates that the evaluation was put off until after plaintiff had her baby, due in April 2001.  Id.  She was asked to return to Dr. Watson two weeks after that evaluation.  Id.

Plaintiff saw Dr. Watson one more time before the delivery of her baby.  On January 29, 2001, his assessment of left knee pain, secondary to pes anserinus bursitis supra chondromalacia of the patella, was unchanged.  Tr. 168.  She had mild tenderness over the medial aspect of the knee, the knee joint line, and the pes bursa. Id.  She had range of motion from 0 - 130 degrees of knee motion, negative compression, and negative apprehension.  Id.  Dr. Watson continued with his work restrictions of sedentary work with the ability to change positions.  Id.  He noted that he would see her after her work capacity evaluation which would be approximately six weeks after her delivery.  Id.

Dr. Watson performed his "closing examination" of plaintiff on May 4, 2001.  Tr. 167.  In reciting her history, he noted that she

12 - FINDINGS & RECOMMENDATION

was followed for "left anterior medial knee pain of unknown etiology secondary to a work related condition." Id. He noted her continued pain, difficulty walking, and difficulty limping. Id. She walked with a crutch. Id. She reported that putting her heel down caused pain over the medial aspect of her knee. Id. His physical exam revealed tenderness over the medial aspect of the knee and knee joint, but negative compression and negative apprehension. Id. She had a range of motion from 0 - 128 degrees of flexion on the left knee and 0 - 145 degrees of flexion on the right knee. Id. She continued to have antalgic gait. Id.

X-rays taken on that date revealed no evidence of fracture, dislocation, or other abnormalities. Id. He assessed her as having left knee pain secondary to a work-related injury. Id.

Dr. Watson found plaintiff to be medically stationary. Id. He stated that her "physical capacity evaluation is per her physical capacity sheet." Id. He noted that her work restrictions would be "per her physical capacity examination." Id. He stated that her permanent restrictions are "per the physical capacity evaluation." He noted that her partial permanent disability "includes a loss of 13 degrees of knee flexion plus a disability with her work restrictions." Id. She was to follow up with Dr. Watson as needed. Id.

Although these chart notes indicate that plaintiff underwent a work or physical capacity evaluation sometime in April 2001, no such records are in the Administrative Record. Disability Analyst Carmen Brummet reported on October 9, 2001, that she called Dr. Watson's office to request a copy of the physical capacity evaluation. Tr. 230. Dr. Watson's office responded that they

13 - FINDINGS & RECOMMENDATION

could not find a copy of the physical capacities evaluation in plaintiff's chart. Tr. 227.

Brummet also called plaintiff who said that she sent disability forms to her insurance company. Tr. 230. Plaintiff told Brummet that she had the physical capacity evaluation done at McKenzie Willamette Hospital. Id. Brummet noted that she (Brummet) already had records from McKenzie Willamette, but the records did not include a physical capacities evaluation. Id.

On October 15, 2001, Brummet noted that Dr. Watson had sent his opinion that plaintiff was released to work on May 4, 2001, with the ability to do sedentary work with a ten-pound lift restriction and a limit on standing to no more than two hours per day. Id. Also on that date, Brummet sent Dr. Watson a letter inquiring if, in regard to his May 4, 2001 chart note noting plaintiff's constant use of a crutch, if the use of a cane or crutch was medically necessary, even for walking short distances, and if so, when it became so and how long it would last. Tr. 223.

In response to her inquiry, Dr. Watson stated that plaintiff's use of a crutch was not medically necessary, even for walking short distances. Tr. 222. He also forwarded to Brummet two documents, each dated September 11, 2001, which set forth the following work restrictions by Dr. Watson: push, pull, lift no more than ten pounds, stand no more than two hours in an eight-hour day, and "subsedentary" work. Tr. 225, 226.

There is no evidence in the record that Dr. Watson saw plaintiff after May 4, 2001. Nonetheless, he issued the following opinion on plaintiff's restrictions on November 13, 2003: lift or carry up to five pounds frequently (defined as 1/3 to 2/3 of a

14 - FINDINGS & RECOMMENDATION

typical eight-hour day); stand or walk continuously for fifteen minutes; stand or walk one hour in an eight hour workday; sit continuously for thirty minutes; sit two hours in an eight-hour workday; never climb, balance, stoop, kneel, crouch, or crawl; frequently reach, handle, finger, feel, or see; and that she would need to lie down or recline for thirty minutes every forty-five minutes.  Tr. 423-24.

B.  Mental Impairments

Psychiatrist Renee A. Bacas, M.D., performed an initial psychiatric evaluation of plaintiff on January 25, 2000.[5]  Tr. 282-88.  Plaintiff complained of having a history of attention deficit hyperactivity disorder (ADHD), but indicated that she had stopped taking medication for the condition because of her pregnancy.  Tr.

_____

[5]  I question the accuracy of this date even though it is written by Dr. Bacas at the top of her evaluation.  First, I note that in the same section of that evaluation, Dr. Bacas notes that plaintiff is unemployed and is on worker's compensation insurance.  Tr. 282.  She also refers to plaintiff being on worker's compensation for her knee injury.  Tr. 283.  All other records in the Administrative Record indicate that plaintiff was working as a deli cutter slicer in January 2000, a couple of months before her knee injury for which she would have been on worker's compensation.  Also, Dr. Bacas states that as of that date, January 25, 2000, plaintiff was one month post-partum, suggesting that she delivered a child in December 1999.  Tr. 282.  But, this is contradicted by other records showing the delivery of her baby at 35 weeks gestation in February 2001 (delivered early by cesarean section because of the presence of a benign tumor) and that in March 2001, she had only one child.  While it is possible Dr. Bacas meant January 25, 2001, instead of 2000, that would still not account for her reference to plaintiff being post-partum when, in January 2001, she clearly would have been pregnant.  More likely than not, Dr. Bacas performed this evaluation in 2001, not 2000.  Additionally, given her reference to plaintiff's post-partum status and additional reference to her breastfeeding, it is likely the evaluation occurred in February 2001, not January.

282.  She noted that she had started taking Ritalin in eighth grade and it had significantly improved her behavior.  Id.  She also reported a history of depression and stated that before her pregnancy, she had taken Celexa.  Tr. 283.

Plaintiff complained of current problems with hyperactivity, restlessness, inability to focus, racing thoughts, and a decreased need for sleep.  Tr. 282.  Dr. Bacas's mental status examination revealed that plaintiff was mildly anxious, her motor behavior was restless, and that she was mildly dysphoric[6].  Tr. 286.  Her thought process was connected and her cognitive functions were intact.  Id.  Dr. Bacas's impression was that plaintiff had a history of ADHD, but with a prior good response to Ritalin.  Tr. 287.  She diagnosed plaintiff as having ADHD (by history) and indicated dysthymic disorder needed to be ruled out.  Id.  Her current Global Assessment of Functioning (GAF) was 65 with a high GAF in the past year of 75.  Id.

Dr. Bacas noted that plaintiff planned to stop breastfeeding so that she could resume her ADHD medication.  Id.  She planned to start plaintiff on Ritalin after initial baseline laboratory tests.  Tr. 288.

Dr. Bacas's chart notes indicate that plaintiff restarted Ritalin on March 13, 2001.  Tr. 279.  On April 17, 2001, it is reported that plaintiff had responded well to Ritalin.  Tr. 276.  Plaintiff reported that she was getting along better with her partner, writing better, and more able to stay on task.  Id.  Her

---

[6]  Dysphoria is a mood of general dissatisfaction, restlessness, anxiety, discomfort, and unhappiness.  Taber's 626.

appetite and sleep were good and she complained of no side effects. Id. She was more calm and less fidgety. Id.

On May 14, 2001, Dr. Bacas noted that plaintiff was doing well on Ritalin with improved focus and decreased distractability. Tr. 275. She had increased stress due to her partner's recent accident at work. Id.

On July 2, 2001, Dr. Bacas noted that plaintiff was experiencing headaches with the generic Ritalin. Tr. 274. She had no other side effects. Id. Her appetite and her sleep were okay and she was more focused and euthymic[7]. Id. On July 30, 2001, plaintiff still complained of headaches on the generic Ritalin. Tr. 273. Plaintiff's insurer refused Dr. Bacas's requests for approval of brand name Ritalin. Id. Nonetheless, the generic Ritalin was working well for plaintiff's ADHD symptoms. Id.

On August 27, 2001, Dr. Bacas noted increased stress for plaintiff, possibly related to plaintiff's recent move. Tr. 271. Dr. Bacas recorded a slight increase in plaintiff's blood pressure and heart rate which may be related to her stress. Id. Plaintiff reported some decrease in her headaches with the generic Ritalin. Id. She reported, however, feeling more distracted recently. Id. Dr. Bacas discussed with plaintiff that her recent move may have exacerbated her ADHD symptoms. Id.

On October 30, 2001, plaintiff reported increased stress as a result of a family member's health problem. Tr. 270. She also had run out of medication because she had been in Portland attending to

---

[7] Euthymia is normal mood; the absence of mood elevation or depression. www.behavenet.com.

17 - FINDINGS & RECOMMENDATION

her family member.  Id.  She reported increased distraction and less focus without her medication.  Id.  Dr. Bacas noted that she had no side effects except for a mild headache, that she was alert, somewhat distracted, but euthymic.  Id.  Because of plaintiff's headache on the generic Ritalin and the possibility of some rebound irritability, Dr. Bacas suggested that plaintiff try Metadate CD in place of the generic Ritalin.  Id.  The Metadate CD is another brand of the same medication as Ritalin.

On November 29, 2001, plaintiff reported to Dr. Bacas that the Metadate was "working 'great.'"  Tr. 399.  However, plaintiff also reported that she was pregnant again and was upset because she did not want to stop taking her medications.  Id.

Also on November 29, 2001, Dr. Bacas wrote a "To whom it may concern" letter which stated that plaintiff was currently under her care and that plaintiff was unable to seek work at the time due to psychiatric reasons.  Tr. 269; see also Tr. 398 (handwritten note expressing same opinion).

On December 20, 2001, Dr. Bacas reported that plaintiff was having difficulty staying on task without her ADHD medication and that she was mildly dysphoric.  Tr. 397.  On January 15, 2002, plaintiff reported to Dr. Bacas that she was feeling depressed and frequently tearful.  Tr. 396.  She also reported a significant increase in her ADHD symptoms without her medication.  Id.  Plaintiff stated that she felt as if her ADHD symptoms were interfering with her ability to function.  Id.  She was also having problems sleeping.  Id.

On February 5, 2002, plaintiff reported feeling depressed with poor motivation and inability to cope well.  Tr. 394.  She still

18 - FINDINGS & RECOMMENDATION

had difficulty sleeping. _Id._ Dr. Bacas discussed medications for depression with plaintiff. _Id._ Plaintiff chose to start taking Prozac. _Id._

On February 21, 2002, plaintiff told Dr. Bacas that she continued to feel depressed and that she noticed no difference with the Prozac. Tr. 393. Her sleep was okay. Dr. Bacas increased the dosage of Prozac. _Id._ On March 7, 2002, plaintiff reported being irritable and angry with no improvement in her mood on Prozac. Tr. 392. Dr. Bacas discontinued the Prozac and started her on Paxil. _Id._ Although plaintiff was scheduled to see Dr. Bacas on April 1, 2002, and again on April 22, 2002, she failed to show up for those appointments. Tr. 390, 391. Thus, the next chart note from Dr. Bacas is dated July 3, 2002, just over a week after plaintiff had her baby on June 24, 2002. Tr. 389.

At that time, plaintiff reported that she had taken Paxil for one month with little benefit. Tr. 389. She reported being tearful and irritable with low energy. _Id._ Dr. Bacas noted her depressed mood. _Id._ She recommended that plaintiff begin taking Celexa. _Id._

On July 17, 2002, plaintiff reported to Dr. Bacas that her mood had improved with the Celexa and that she had no side effects. Tr. 388. She requested that she restart on stimulant medication for her ADHD because she was having trouble focusing and sitting still. _Id._ Dr. Bacas noted that plaintiff had responded well to the Metadate CD and had no headaches. _Id._ She continued her on Celexa and restarted the Metadate. _Id._

On August 7, 2002, Dr. Bacas noted that plaintiff was doing okay. Tr. 387. Because the Oregon Health Plan had refused to fund

19 - FINDINGS & RECOMMENDATION

Metadate, she was taking Ritalin (presumably the generic drug). _Id._ Plaintiff reported frequent headaches. _Id._ She also told Dr. Bacas that her mood was okay, although she still felt down. _Id._ Dr. Bacas noted that plaintiff was mildly dysphoric. _Id._ Dr. Bacas planned on giving plaintiff a coupon for a Metadate refill and to increase her dose of Celexa. _Id._

On August 28, 2002, Dr. Bacas noted that plaintiff reported doing okay. Tr. 386. She was having intermittent headaches, even on the Metadate. _Id._ Plaintiff did report that her mood had improved significantly without any side effects. _Id._ Dr. Bacas continued her on the Metadate and Celexa and noted that plaintiff was doing better. _Id._

On September 25, 2002, plaintiff reported that her mood had been more depressed lately. Tr. 384. Dr. Bacas noted that she was tearful and dysphoric. _Id._ She prescribed Wellbutrin in addition to her other medications. _Id._ She indicated that plaintiff suffered from major depressive disorder as well as ADHD. _Id._ In October 2002, plaintiff reported improvement in her mood and energy since starting the Wellbutrin. Tr. 382. She was still having some problems with distractability and thought that Ritalin was still needed for her ADHD symptoms. _Id._ She reported fewer headaches on regular acting Ritalin rather than the sustained release variety. _Id._ Dr. Bacas indicated that she was calm, focused, and euthymic. Tr. 381. Plaintiff requested a change back to the sustained release Ritalin which she thought provided more benefits than the regular acting variety. _Id._

In November 2002, plaintiff was adjusting to the break up of her relationship and living with her mother. Tr. 377. As a

20 - FINDINGS & RECOMMENDATION

result, she felt more stressed and depressed. <u>Id.</u> She continued to take her medications (Wellbutrin, Ritalin, and Celexa) and reported no side effects. <u>Id.</u> In December 2002, Dr. Bacas noted the continued increased stress as a result of issues with plaintiff's ex-boyfriend and plaintiff's report of some increase in irritability. <u>Id.</u> She noted that plaintiff was mildly dysphoric. <u>Id.</u>

On January 3, 2003, plaintiff reported that she started school at Lane Community College, but also that she had been feeling more depressed for the last two to three weeks. Tr. 375. She was tearful and depressed. <u>Id.</u> Her diagnoses remained as ADHD and major depressive disorder. <u>Id.</u>

Also on that date, plaintiff switched care from Dr. Bacas to Dr. Randy Frank, D.O. Tr. 374. As she explained at the hearing, Dr. Bacas moved out of state and Dr. Frank, in the same practice as Dr. Bacas, took over her care. Tr. 474. Dr. Frank continued her on Wellbutrin, Celexa, and Ritalin, and appears to have added a new anti-depressant, Desyrel. Tr. 369-72, 374.

In February 2003, Dr. Frank noted that plaintiff reported improvement. Tr. 368. He continued her medications. <u>Id.</u> In April 2003, he again noted her improvement, but also remarked that she still had some lability. Tr. 367. Plaintiff reported to Dr. Frank that she was compulsively checking locks and compulsively washing her hands. <u>Id.</u> He noted her red, chapped hands. <u>Id.</u> She was very anxious, but had appropriate affect. <u>Id.</u> Dr. Frank diagnosed her as having obsessive compulsive disorder, along with her depression and ADHD. <u>Id.</u> Later that month, he noted that her mood was slightly better, but overall, plaintiff felt that there

21 - FINDINGS & RECOMMENDATION

was little improvement with her current regime.  Id.  She told Dr.

Frank she felt stressed and overwhelmed with being pressured to get

an education and care for two young children.  Tr. 366.  There were

no changes in her diagnoses or her medications.  Id.

In mid-May 2003, plaintiff called Dr. Frank's office to report

that she was feeling overwhelmed and having a hard time breathing.

Tr. 362.  Dr. Frank was unable to reach her the day she called, but

left a message the next day.  Id.  She next saw him on May 30,

2003, when she reported having panic attacks.  Tr. 361.  He

discussed her need to have additional resources to help her.  Id.

He previously had discussed this with her welfare caseworker.  Id.

Dr. Frank refers to an investigation by "SCF," presumably Oregon's

Division of Services to Children and Families, finding plaintiff

not neglectful.  Id.

On June 27, 2003, Dr. Frank noted that plaintiff was doing

much better with the addition of Neurontin which he had prescribed

on May 30, 2003.  Tr. 359.  He stated that there was a marked

decrease in plaintiff's anxiety.  Id.  Under the section for

"assessment," he stated that her obsessive compulsive disorder and

depression were improved and that her ADHD was well controlled.

Id.

A July 29, 2003 progress note by Dr. Frank states that her

anxiety is much better.  Tr. 357.  He appears to have added the

anti-psychotic medication Seroquel to her other medications.  Id.;

see also Tr. 353 (referring to Seroquel prescription for panic

attacks).  In late August, he noted that she was experiencing

multiple stressors including a break-up with her boyfriend and

losing her home.  Tr. 355.  Sleep was her biggest issue.  Id.  He

22 - FINDINGS & RECOMMENDATION

continued her on her previous medications, with an increase in Seroquel. Id.

On October 8, 2003, plaintiff called Dr. Frank to report that her medications were not working because she had increasing anxiety and depression and was not sleeping well. Tr. 350. When Dr. Frank saw her the next week, plaintiff reported an increase in her anxiety and panic attacks. Tr. 349. Dr. Frank increased her Seroquel and Neurontin and continued her on her other medications. Id.; Tr. 348.

On October 17, 2003, Dr. Frank wrote a "To Whom it May Concern" letter which stated that plaintiff suffered from several different psychiatric disorders, including major depressive, obsessive-compulsive, and attention deficit disorders. Tr. 345. He noted her "rather complex array of medications" and her attempt to raise two young children as a single parent. Id. He concluded that "[a]s a consequence of her clinical condition, she has not bee[n] able to work for the past year." Id.

On October 28, 2003, Dr. Frank completed a mental residual functional capacity assessment of plaintiff. Tr. 425-26. There, he rated her moderately limited in the following categories: (1) the ability to remember locations and work-like procedures; (2) the ability to sustain an ordinary routine without special supervision; (3) the ability to make simple work related decisions; (4) the ability to ask simple questions or request assistance; (5) the ability to accept instructions and respond appropriately to criticism from supervisors; (6) the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (7) the ability to respond appropriately to changes in

23 - FINDINGS & RECOMMENDATION

the work setting; (8) the ability to travel in unfamiliar places or use public transportation; and (9) the ability to set realistic goals or make plans independently of others. Id.

He assessed her as markedly limited in the following categories: (1) the ability to understand and remember very short and simple instructions; (2) the ability to understand and remember detailed instructions; (3) the ability to carry out very short and simple instructions; (4) the ability to carry out detailed instructions; (5) the ability to maintain attention and concentration for extended periods; (6) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (7) the ability to work in coordination with or proximity to others without being distracted by them; (8) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (9) the ability to interact appropriately with the general public; and (10) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Id.

II.  Plaintiff's Testimony

Plaintiff testified that she has problems writing because she skips words. Tr. 458. She described herself as thinking too fast and then skipping words. Id. She described a similar problem with reading in that she skips ahead and loses her place. Id. She does not read much for pleasure. Id. She indicated that her reading and writing problems are attributable to her ADHD. Tr. 460. She can do simple math such as addition and subtraction and make

24 - FINDINGS & RECOMMENDATION

change. Tr. 458.

In terms of her knee, she stated that it was painful and that after fifteen minutes of walking, she needed to sit and elevate it. Tr. 459. Sometimes she gets sharp pains; other times she experiences a throbbing pain. Tr. 463. Continuing to walk on it after it starts to hurt can produce pain up to a level 10 on a 0 to 10 scale. Id. She can stand for up to fifteen minutes, sometimes up to twenty-five, at a time. Tr. 464.

Even when her knee hurts, she can sit as long as she can elevate her knee. Tr. 468. Without elevation, the pain remains. Id. Climbing stairs hurts her knee. Tr. 471.

She rests throughout the day. Id. In trying to describe her ability to alternate between sitting and standing throughout the day, plaintiff indicated that she could probably sit for forty-five minutes, Tr. 469, 472, but that if she were required to stand, at some point the pain would not go away, even if she had the option to return to sitting. Tr. 469-71. She would need a rest of longer than forty-five minutes for the pain to decrease. Tr. 472.

At the time of the hearing, she was receiving no specific treatment for her knee other than wearing a brace if she planned on walking or standing for any length of time, and elevating it when she sleeps. Tr. 473.

As for her mental impairments, plaintiff first discussed her obsessive-compulsive disorder. Tr. 459. She explained that she checks doors over and over and is very particular about such things as the way clothes are hung or the length of shoelaces. Id. She stated that this interferes with her daily life and would also interfere with work. Id.

25 - FINDINGS & RECOMMENDATION

She has major depression and panic attacks that cause crying attacks and make it hard to breathe.  Id.  Although they occur daily, they get "really, really bad" three to four times per week. Id.  She also experiences tightness in the chest.  Tr. 480.  The actual panic attack lasts for approximately half an hour, but it takes a couple of hours for it to completely go away.  Tr. 461. Occasionally, it can last longer.  Id.

As for the depression, she feels hopeless, stressed, and down. Tr. 464.  She wants to sleep all the time.  Id.  She does not want to talk to people.  Tr. 465.

Plaintiff also testified that she gets severe migraine headaches, as often as four to five times per week.  Tr. 466.  She indicated that she cannot do much of anything when she has a migraine.  Tr. 474.  She also gets blurred and double vision, although she was not sure if it was caused by the migraine, a medication side effect, or something else.  Id.; Tr. 475.

She further testified that she has a very poor memory and finds it hard to do tasks or finish what she starts.  Tr. 466.  She gave an example of walking away when she was only partially finished with washing the dishes.  Tr. 467.

While sitting helps her knee, it is hard because of her "ADD." Id.  It is hard for her to sit still.  Id.  She gets fidgety.  Tr. 469.

At the time of the hearing, plaintiff lived with her father and stepmother and her children.  Tr. 478.  She sometimes helps with the dishes and she can vacuum, dust, and do other basic household chores.  Tr. 478.  She does not do the grocery shopping or any major meal preparation.  Tr. 478-79.  She does no yard work.

26 - FINDINGS & RECOMMENDATION

Tr. 479.

She has a driver's license and drives only an automatic transmission because using a clutch with a manual transmission hurts her knee. Id. She stated that she does not drive very often. Id. She does not have any hobbies and finds it hard to go to the movies because her ADHD interferes with her ability to sit through it. Id.

III. Lay Witness Testimony

Daniel Magden, plaintiff's ex-boyfriend and father of her children, testified at the hearing. Tr. 481-82. He had lived with her for two and one-half out of the three years prior to the hearing and at the time of the hearing, saw her three to four times per week. Tr. 482, 485.

He described that with her knee injury, she cannot sit or stand too long. Tr. 482. He noted her panic attacks, her anxiety, and her being overwhelmed. Id. He stated that she could sit on average for fifteen or twenty minutes "and then she's rotating." Tr. 483. By that, he meant she moves to sitting or standing or to the recliner, or to another position where she can elevate her leg. Id. He estimated that she probably spends fifteen to thirty minutes in a position before rotating again. Id.

He stated that plaintiff's obsessive-compulsive disorder was manifested by her spending all day putting away laundry in a certain way. Tr. 484. He observed her panic attacks when she broke out "crying hysterics" and unable to catch her breath. Id. He has observed her having three or four panic attacks a day. Id. He indicated that she suffered from daily migraines. Tr. 484-85.

IV. Vocational Expert Testimony

27 - FINDINGS & RECOMMENDATION

Vocational Expert (VE) Mark McGowan testified at the hearing. The ALJ posed three hypotheticals to the ALJ. First, the ALJ described a person as twenty-four years old with a high school education and with plaintiff's past relevant work who could frequently lift ten pounds, stand or walk for two hours out of an eight-hour day with a sit/stand option, occasionally climb ladders, ropes, or scaffolds, and occasionally kneel, crouch, or crawl. Tr. 486-87.

In response, the VE testified that such a person could perform the job of touch-up screener for printed circuit boards which is sedentary, unskilled work, or semiconductor assembler, which is sedentary, semi-skilled work. Tr. 487. He also identified a food and beverage clerk, which is sedentary, unskilled work, as a possibility. Tr. 487.

The ALJ's second hypothetical took all of the parameters and limitations from the first hypothetical, and then added a limitation to simple, routine tasks and instructions, and occasional contact with the general public and co-workers. Tr. 487-88. In response to this hypothetical, the VE stated that such a person could still perform the touch-up screener and semiconducter assembler jobs, but not the food and beverage clerk position. Tr. 488.

Finally, the ALJ added, for his third hypothetical, a limitation of standing or walking for fifteen minutes, followed by the need to sit and elevate both legs for up to two hours. Id. The VE indicated that while a job could probably be done with that hypothetical, common sense would raise the question of how productive the worker would be under those circumstances. Id.

28 - FINDINGS & RECOMMENDATION

In response to questioning by plaintiff's counsel, the VE testified that competitive employment is not necessarily ruled out if the person had a marked limitation on contact with the public and co-workers. Tr. 489. Rather, he said, it would depend on the job. Id. He indicated it would not rule out the touch-up screener or semiconductor assembler because those jobs require very little contact with others. Id. However, a marked limitation in concentration, persistence, and pace, would rule out the jobs identified by the VE. Tr. 490. Finally, if the person would also miss two or more days of work per month on a regular basis, it would rule out the unskilled jobs identified by the VE. Id.

## THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in any substantial gainful activity since her alleged onset date. Tr. 16, 25. The ALJ then found that plaintiff had severe impairments of musculoskeletal problems, major depression, obsessive compulsive disorder, and an attention deficit disorder. Tr. 17. While finding the impairments to be severe, he concluded they did not meet or equal any listed impairments. Id.; Tr. 25.

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to lift ten pounds frequently and occasionally, to stand and walk a maximum of two hours per day with the flexibility to change position between sitting and standing at will, and to occasionally kneel, crouch, and crawl. Tr. 24. Additionally, he limited her to simple routine tasks and instructions and only occasional contact with the general public and co-workers. Id.

In reaching this RFC determination, the ALJ rejected Dr.

29 - FINDINGS & RECOMMENDATION

Watson's November 2003 physical capacities assessment, Dr. Bacas's November 2001 opinion that plaintiff could not seek work, Dr. Frank's October 2003 opinion regarding plaintiff's inability to work and his mental residual functional capacity assessment, much of plaintiff's subjective testimony, and much of Magden's lay testimony.

In discussing Dr. Watson's treatment of plaintiff from March 2000 to May 2001, the ALJ noted that radiological findings showed minimal orthopedic injury which was inconsistent with plaintiff's claims of excruciating pain and insistence on using crutches. Tr. 17. The ALJ noted that in November 2000, Dr. Watson did not declare plaintiff disabled, despite her disabling pain allegations, but rather indicated that she could work at a sedentary job with the opportunity for frequent change of position. Id. The ALJ also noted the medical references to her symptom embellishment such as a "positive apprehension in compression tests," and the physical therapist's notation that she had a "definite psychosomatic overlay." Id.

The ALJ also noted Dr. Watson's references to improvement in her condition over time. Tr. 18. Although certain tests were negative, plaintiff continued to present with claims of inability to stand or walk. Id. This, the ALJ noted, was despite the fact that she was treated in the emergency room at one point for injuries she received when she "apparently was trying to climb up into a garage loft from a free standing counter." Id. The ALJ also noted plaintiff's care of a newborn and performance of household chores. Id.

Although the ALJ was inclined to reject Dr. Watson's September

30 - FINDINGS & RECOMMENDATION

2001 assessment, which restricted plaintiff to sedentary work, because it was based on plaintiff's subjective symptoms and was unsupported by physical findings, he stated that he would "err[] on the side of caution [and] accept that the claimant is limited to sedentary exertion, because the [Developmental Disability Services] staff also has endorsed such limitations." Id.

The ALJ then rejected Dr. Watson's November 13, 2003 physical capacities assessment which included more restrictive limitations than his September 2001 assessment. Tr. 18-19. The ALJ noted that the November 2003 assessment limited plaintiff to lifting a maximum of five pounds, sitting for no longer than two hours, and standing and walking for no longer than one hour in an "entire day."[8]

The ALJ rejected this assessment for several reasons. First, he indicated that it was unreasonable on its face because such extreme limitations, especially the limitation to one hour of standing or walking in twenty-four hour period, was completely inconsistent with the other evidence that plaintiff performs household chores and fulfills virtually all of her parenting duties. Tr. 19. Second, the ALJ noted that there appeared to be no medical foundation to support the revised assessment since the medical records showed that Dr. Watson had not seen plaintiff for more than two years. Id. Third, he indicated that even when Dr. Watson had been more actively treating plaintiff, the limitations given at that time were not credible because they were based almost exclusively on plaintiff's reports of pain which the ALJ found to

---

[8] This was an error by the ALJ. The limitation is for an eight-hour day, not a twenty-four hour period.

31 - FINDINGS & RECOMMENDATION

be unreliable.  Id.

The ALJ rejected Dr. Bacas's November 29, 2001 opinion that plaintiff was unable to work at that time due to psychiatric reasons, as conclusory and lacking in specific functional limitations that could be used to determine the extent of plaintiff's mental impairment and its impact on her vocational functioning.  Id.  Additionally, the ALJ noted that Dr. Bacas's opinion did not indicate whether the inability to work was temporary or signified long-term disability.  Id.  The ALJ further noted that while treating with Dr. Bacas, plaintiff's ADHD symptoms improved with medication.  Tr. 19-20.  She also reported improvement in her depression with medication.  Tr. 20.  While she had some exacerbations of these conditions, especially while she was pregnant and was unable to take her medications, and while she experienced some situational stress at times, overall she experienced improvement in her ADHD and depression when treating with Dr. Bacas.  Tr. 20.

The ALJ noted that not until plaintiff began treating with Dr. Frank did she report symptoms of panic attack and obsessive-compulsive disorder.  Tr. 20.  Although in October 2003 Dr. Frank found plaintiff markedly impaired in several functional capacities, the ALJ rejected his assessment.  First, the ALJ noted that Dr. Frank's treatment records did not show a continuous period of acute emotional disturbance during the "past year."  Tr. 21.  The ALJ noted that her depression had responded well to treatment and any exacerbations lasted less than one year.  Id.  Moreover, the exacerbations appeared to have been related to non-medical reasons such as situational stressors or an inability to take medication.

32 - FINDINGS & RECOMMENDATION

<u>Id.</u> He also noted that the anxiety and obsessive-compulsive symptoms had been recorded in Dr. Frank's chart notes for only about six months before Dr. Frank's October 2003 assessment. And, the ALJ noted, there was indication that these conditions also responded to treatment.

Second, the ALJ noted that the several "marked" ratings were inconsistent with the abilities of a person who was the primary caregiver of two highly dependent preschool children. <u>Id.</u> He stated that even during periods of exacerbation of her hyperactivity symptoms, including inattention and easy distractability, plaintiff did not report that she was unable to perform basic activities for the care for her children. <u>Id.</u> The ALJ remarked that the ages of plaintiff's children required plaintiff to exercise considerable vigilance which was inconsistent with the limitations imposed by Dr. Frank. <u>Id.</u>

Third, the ALJ noted that Dr. Frank's chart notes did not document specific allegations of functional loss and that his limitations were far more severe than those documented in his chart notes. <u>Id.</u> He had performed no psychometric or other objective testing. <u>Id.</u> Rather, his ratings appeared to be based almost exclusively on the plaintiff's presentation and subjective complaints, which he found were exaggerated, even in regard to her mental functional limitations. <u>Id.</u>

The ALJ then rejected plaintiff's testimony regarding her limitations. Tr. 22-23. He found that she exhibited a pattern of overstatement. Tr. 22. He noted that much of her alleged functional limitations was unreasonable in light of her parenting responsibilities. <u>Id.</u> The ALJ rejected her testimony regarding

33 - FINDINGS & RECOMMENDATION

daily migraines lasting the majority of the day as inconsistent with the medical record. Tr. 22-23. He again noted the inconsistency between parenting her two small children and her claim that she has serious problems with memory and concentration. Tr. 23.

He also rejected her testimony regarding her knee problems. Id. The ALJ noted that she had not been treated for more than two years, that when she was treated there was an indication that her subjective complaints were grossly out of proportion to the underlying objective findings, and that some of her allegations had no medical foundation. Id.

As for Magden, the ALJ found his testimony not credible because it was unsupported by the medical record. Tr. 23. For example, he noted that Magden indicated that plaintiff could sit for only fifteen or twenty minutes and that this was inconsistent with the other evidence, including plaintiff's testimony that sitting did not increase her knee pain. Id.

Based on his RFC, the ALJ determined that plaintiff could not return to her past relevant work. Tr. 24, 25. He then found that based on the VE's testimony, there were significant jobs in the national economy that she could perform. Tr. 24, 26. Thus, the ALJ determined that she was not disabled. Tr. 25, 26.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

34 - FINDINGS & RECOMMENDATION

Disability claims are evaluated according to a five-step procedure. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991). The claimant bears the burden of proving disability. <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989). First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20

C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla" but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

DISCUSSION

Plaintiff argues the ALJ erred in the following respects:

(1) the ALJ's RFC was improper because the ALJ (a) failed to conclude that plaintiff's reading and writing limitations precluded her from performing relatively simple work; (b) concluded that plaintiff's mental limitations were not as severe as established by the record; (c) improperly rejected the opinions of plaintiff's treating physicians as being based almost exclusively on her subjective symptoms; (d) improperly rejected Dr. Watson's November 2003 assessment; (e) improperly accepted determinations made by DDS psychologists who did not opine on plaintiff's obsessive-compulsive disorder or depression which the ALJ found to be severe impairments; (f) improperly relied on medical provider statements regarding plaintiff's psychosomatic condition; and (g) failed to account for the hyperactivity part of plaintiff's ADHD diagnosis and its impact on her ability to sit;

(2) the ALJ improperly rejected Magden's lay testimony;

(3) the ALJ failed to present a complete hypothetical to the ALJ;

(4) the ALJ relied on erroneous VE testimony; and

36 - FINDINGS & RECOMMENDATION

(5) the ALJ failed to develop the record.

I.   RFC

As noted above, plaintiff asserts seven separate reasons in support of her position that the ALJ's RFC was erroneous.  I address each in turn.

A.   Reading and Writing Limitations

The ALJ accepted that plaintiff's allegation that she has limited reading and writing ability is consistent with her long-term diagnosis of ADHD.  Tr. 22.  He noted that such limitations might affect her ability to perform tasks involving significant reading and writing.  Id.  However, he explained, it did not appear that her basic functioning with regard to her ability to do simple tasks was significantly affected.  Id.  He noted that she had worked in the past at relatively simple jobs despite her ADHD symptoms.  Id.  Accordingly, he concluded, her cognitive problems were not significant enough to preclude her from performing relatively simple work.  Id.

Plaintiff contends that the ALJ had no evidence to substantiate his determination regarding plaintiff's reading and writing ability.  Plaintiff argues that the ALJ should have sought information from plaintiff's medical providers regarding the significance of her reading and writing limitations or should have required additional consultative examinations to assess the scope of these limitations and how they impact plaintiff's ability to work.  Additionally, plaintiff contends that it was error for the ALJ to rely on plaintiff's supposed success in her previous relatively simple jobs because, according to plaintiff, plaintiff was not able to maintain work even at simple levels.

37 - FINDINGS & RECOMMENDATION

I reject plaintiff's arguments. The ALJ did rely on the evidentiary record to support his decision. The record includes plaintiff's work history, e.g. Tr. 81-88, 124, 486, and the ALJ relied on that in noting plaintiff's ability to perform previous simple work. While plaintiff argues in her brief that she was unable to maintain work at simple levels, there is no evidence in the record that any of her prior work was compromised by her alleged deficits in reading and writing. The ALJ also noted plaintiff's ability to pay bills. It was reasonable for the ALJ to conclude that her ability to do this task and her previous simple work is inconsistent with a significant limitation in the ability to read and write.

Finally, there was no basis for the ALJ to contact plaintiff's medical providers or to seek additional consultative examinations in regard to her reading and writing abilities. An ALJ's duty to develop the record further is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). The record regarding her reading and writing function is not ambiguous and is not inadequate. The fact that the record does not support plaintiff's claimed level of dysfunction does not require the ALJ to further develop the record. The ALJ's limitation in his RFC to jobs with simple, routine tasks and instructions adequately addressed plaintiff's reading and writing deficits.

B. Mental Limitations

Plaintiff contends that the ALJ erred in determining the

38 - FINDINGS & RECOMMENDATION

severity of plaintiff's mental limitations by relying on her ability to parent her children. She suggests it was error to conclude that she was fully competent in taking care of her children and it was further error to conclude that taking care of her children was inconsistent with the severity of her alleged impairments.

Plaintiff argues that the fact that she underwent an investigation by SCF shows that her care for her children was suspect and the ALJ's characterization of her as being "fully competent" in parenting responsibilities was not supported by the record. I disagree.

The reference to the SCF investigation appears in the midst of a chart note by Dr. Frank. Tr. 361. The note states as follows: "Discussed her need to have additional resources - as I discussed with caseworker[.] Also had SCF investigate - was not found to be neglectful[.]" Id. This note provides no information regarding the need or reason for an investigation. There is no evidence in the Administrative Record that the investigation was prompted by some concern that plaintiff's parenting was inadequate. While that might be the case, it could also have been routine. Furthermore, there is no information as to what the investigation consisted of, who conducted it, or when it was conducted. Thus, the single reference to an SCF investigation is not substantial evidence that plaintiff was not a fully competent parent.

Moreover, to the extent the chart note provides any relevant information, it indicates that plaintiff was not a neglectful parent. While there are references to her being overwhelmed at times with her parenting responsibilities, such sentiment is to be

39 - FINDINGS & RECOMMENDATION

expected for a single parent of two small children. Nonetheless, as the ALJ noted, the record establishes that plaintiff managed her parenting duties adequately. Finally, it was not unreasonable for the ALJ to conclude that plaintiff's claimed levels of mental impairment was inconsistent with a parent who is adequately supervising and providing for her small children.

C.  Rejection of Treating Physicians' Opinions
    Because Based on Subjective Symptoms

Plaintiff contends that there is no evidence to support the ALJ's assertion that Dr. Watson's opinion was based on plaintiff's reporting of her subjective symptoms. Plaintiff further contends that the ALJ should have inquired with Dr. Watson regarding the origin of the limits or their validity. I disagree.

First, the ALJ noted that Dr. Watson's September 2001 and November 2003 opinions regarding plaintiff's functional limitations were largely based on her reports of subjective symptoms. But, the ALJ nonetheless accepted Dr. Watson's September 2001 assessment. To the extent plaintiff's argument is directed at the ALJ's comments regarding the September 2001, it is irrelevant because the ALJ ultimately relied on that assessment.

Second, Dr. Watson's chart notes are replete with information indicating that there was no objective basis for the level of pain claimed by plaintiff. As detailed in the background section above, the x-rays, MRI, and bone scan were negative. There are notations indicating that the nature of her injury would not ordinarily cause the claimed pain and limitations. E.g., Tr. 182, 178. Thus, the ALJ correctly concluded that the limitations assigned by Dr. Watson were based on plaintiff's subjective report of her symptoms. This

was not error.

"A physician's opinion of disability premised to a large extent upon the claimant's own accounts of [her] symptoms and limitations may be disregarded where those complaints have been properly discounted." Morgan v. Commissioner, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotation omitted).

The ALJ is responsible for determining credibility. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). When determining the credibility of a plaintiff's complaints of pain, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain when determining whether a claimant's complaints of pain are exaggerated. Id.

The ALJ found that plaintiff overstated the nature and severity of her pain and physical limitations. He noted that despite her complaints of significant pain, she engaged in significant physical activity on the occasion where she climbed onto a counter and attempted to climb up into a garage loft. He noted her ability to care for her children without significant help

from her partner, her ability to perform household chores, the fact that she had not been treated for her orthopedic problems for more than two years, and inconsistencies between her testimony and the medical records such as her testimony of daily debilitating migraine headaches when the records revealed intermittent headaches which had been somewhat responsive to medication.

The ALJ met his burden of articulating clear and convincing reasons to conclude that plaintiff's subjective testimony was unreliable. As a result, his rejection of Dr. Watson's functional assessments on the basis that they were based primarily on plaintiff's unreliable reporting of subjective symptoms, is supported by the record. Finally, the ALJ was under no duty to contact Dr. Watson regarding his functional assessments as there was no ambiguity or inadequacy in the record.

Plaintiff also contends that it was error for the ALJ to reject Dr. Frank's October 2003 mental residual functional capacity assessment on the bases that it was based primarily on plaintiff's subjective complaints and the limitations were inconsistent with the evidence that plaintiff adequately cared for her two young children.

The ALJ correctly noted that there is no evidence that Dr. Frank performed any psychometric testing of plaintiff or otherwise documented functional loss by any objective means. Thus, the ALJ did not err in concluding that Dr. Frank's opinion was primarily based on plaintiff's presentation and subjective complaints.

The ALJ then noted that given plaintiff's overstatement of the nature and severity of her physical limitations, there was a concern regarding the exaggeration of her mental functional

42 - FINDINGS & RECOMMENDATION

limitations. The ALJ stated that despite plaintiff's claim of frequent panic attacks, Dr. Frank had not endorsed a panic disorder diagnosis. The ALJ remarked that despite her testimony that she walks away from tasks half finished due to problems with her concentration and memory, there was no evidence that she left essential tasks, especially those concerning her young children, unfinished or deferred.

Again, the ALJ's conclusions are supported in the record. The ALJ articulated specific bases supported by substantial evidence in the record to conclude that plaintiff exaggerated both her physical and mental limitations. As such, he was entitled to reject her treating physicians' functional assessments which were primarily based on her subjective complaints. Moreover, to the extent the rejection of Dr. Frank's assessment was also based on its inconsistency with plaintiff's ability to adequately take care of two active and busy young children, that was not error as discussed above.

D. Dr. Watson's November 2003 Assessment

Plaintiff next argues that the ALJ erred in rejecting Dr. Watson's November 2003 functional assessment on the basis that it was unreasonable as a matter of law. Plaintiff correctly notes that the ALJ erred in reading Dr. Watson's assessment regarding her ability to stand or walk only one hour in a twenty-four hour period. The assessment limits plaintiff to one hour of standing or walking in an eight-hour day, not a twenty-four hour day.

Nonetheless, as explained above in the discussion of the ALJ's decision, the ALJ gave three independent reasons for rejecting Dr. Watson's opinion: (1) such extreme limitations, notably the

43 - FINDINGS & RECOMMENDATION

misinterpreted stand/walk limitation, were unreasonable on their face; (2) lack of medical foundation given that Dr. Watson had not treated plaintiff for more than two years when this assessment was given and the limitations were more restrictive than his previous assessment given at the conclusion of her treatment with him; and (3) the assessment was based on plaintiff's exaggerated subjective complaints of pain.

While plaintiff legitimately attacks the basis for the ALJ's first reason in support of the rejection, the other bases are supported by substantial evidence in the record. As discussed in the previous section, the ALJ did not err when rejecting Dr. Watson's functional limitations for the reason that the limitations were based on plaintiff's subjective symptoms. And, the ALJ was correct in noting that there was simply no medical evidence to support the change to more restrictive limitations between September 2001 and November 2003 when Dr. Watson had not examined or treated plaintiff once during that time period. Thus, the ALJ's error was harmless. Batson v. Commissioner, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard).

E.  DDS Psychologist Determinations

Plaintiff suggests that the ALJ erred because even though he found that plaintiff's major depression and obsessive-compulsive disorder were severe impairments, the ALJ, in assessing plaintiff's mental residual functional capacity, "apparently" accepted determinations made by "DDS physicians," none of whom diagnosed plaintiff with, or provided assessments of, obsessive-compulsive disorder or major depression. Plaintiff believes that it was improper to rely on the opinions of the DDS professionals when they

44 - FINDINGS & RECOMMENDATION

did not provide assessments based on all of plaintiff's impairments. Rather, plaintiff suggests, because Dr. Frank is the only medical provider who rendered a functional assessment based on all of plaintiff's mental impairments, his assessment is the only valid one.

I reject plaintiff's argument because I do not read the ALJ's determination as relying on the findings of the DDS reviewing psychologists. The ALJ's decision contains few references to any reports by the DDS psychologists. The first reference appears in the context of the ALJ's discussion of Dr. Watson's September 2001 physical capacities assessment. There, the ALJ states that he is inclined to reject the assessment, but erring on the side of caution, he accepts the restriction to sedentary work because the DDS staff also endorsed the restriction. Tr. 18. Rather than work to plaintiff's disadvantage, the ALJ relied here on the DDS restriction as support for accepting the opinion of a treating physician that the ALJ was otherwise likely to reject.

The next reference is simply to the fact that the DDS staff contacted Dr. Watson to clarify the medical evidence in his charts that plaintiff was using a crutch. Tr. 18. In response to the inquiry by DDS, Dr. Watson stated that plaintiff's use of the crutch was not medically necessary. This reference has no relevance to plaintiff's argument.

Finally, the last reference to any finding by DDS staff is in the context of discussing Dr. Bacas's November 2001 opinion that plaintiff was unable to seek work. Tr. 19. There, the ALJ noted that the time period covered by Dr. Bacas's opinion was unclear and that two DDS psychologists had, at least through May 2002,

45 - FINDINGS & RECOMMENDATION

indicated that plaintiff's ADHD had not imposed any significant functional restrictions. Tr. 19-20.

This reference by the ALJ was used only to suggest that to the extent Dr. Bacas's opinion could be read to cover the period up through May 2002, it was inconsistent with the opinions of the DDS psychologists regarding the limitations imposed by plaintiff's ADHD. It is not an indication that the ALJ relied on any functional assessment by the DDS staff in determining plaintiff's RFC. Inasmuch as plaintiff does not specifically challenge the ALJ's rejection of Dr. Bacas's November 2001 opinion, it is irrelevant that the ALJ noted the DDS psychologists' inconsistent opinions as a basis for that rejection. Furthermore, I agree with defendant that it is simply irrelevant that the DDS psychologists did not account for plaintiff's obsessive-compulsive disorder or major depression because the ALJ did not rely on their findings.

F.   Statements Regarding Psychosomatic Overlay

Plaintiff challenges as improper the ALJ's discussion of the statement by plaintiff's physical therapist that plaintiff had a "definite psychosomatic overlay." While her argument is not quite clear, she appears to concede that while it may not have been error for the ALJ to rely on the comment as a basis for discrediting plaintiff's subjective complaints of pain or statements of limitation, it was error not to rely on the comment as a basis to order further medical testing to ascertain how "this new diagnosis may affect her working." Pltf's Brief at p. 15.

Psychosomatic illness generally refers to complaints of physical distress of psychological origin. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.07 (regarding somatoform disorders); Thomas

46 - FINDINGS & RECOMMENDATION

L. Stedman, <u>Stedman's Medical Dictionary</u> 528 (27th ed. 2000). And, while the possibility exists that it may be an independent diagnosis in its own right, the ALJ here explained that plaintiff had not been diagnosed "as having a conversion disorder or any other mental condition likely to cause actual psychogenic pain." Tr. 22. The ALJ's assessment of the record in this regard is not challenged and is supported by substantial evidence in the record. The reference by plaintiff's physical therapist to her psychosomatic overlay does not, by itself, require the ALJ to obtain additional medical or functional capacity evidence when the record is otherwise devoid of any basis for finding plaintiff to have a somatoform or similar disorder.

G. Hyperactivity

Plaintiff contends that the ALJ erred by accepting that plaintiff had attention deficit disorder (ADD) rather than ADHD. The significance of this error, according to plaintiff, is that the ALJ may have discounted the effect of plaintiff's hyperactivity on her ability to sit for a certain period of time.

Plaintiff correctly notes that in his initial recitation of plaintiff's severe impairments, the ALJ referred to ADD, not ADHD. Tr. 17. Plaintiff neglects to point out, however, that the ALJ's decision is replete with references to her ADHD. <u>E.g.</u> Tr. 22 (referring to "her pre-existing ADHD," "Her diagnosis of ADHD," and her "long term diagnosis of ADHD"). More likely than not, the ALJ's reference to ADD rather than to ADHD was simply an oversight or a typographical error and not an intentional disregard of her hyperactivity.

Additionally, the medical records demonstrate that plaintiff

47 - FINDINGS & RECOMMENDATION

responded well to Ritalin or Metadate which decreased her ADHD symptoms. _E.g._, Tr. 270 (Metadate "working great"), 274 (Ritalin working well for plaintiff's ADHD symptoms), 275 (doing well on Ritalin with improved focus and decreased distractability), 276 (responded well to Ritalin), 359 (ADHD well controlled), 381 (plaintiff calm and focused on Ritalin). The records demonstrate that any error by the ALJ in overlooking the hyperactivity portion of her ADHD diagnosis was harmless because her hyperactivity symptoms were well controlled with medication.

Finally, the ALJ's RFC included a sit/stand option. To the extent plaintiff's ADHD, even on medication, causes difficulty with sitting for extended periods of time, the ALJ's sit/stand limitation accommodates plaintiff's symptoms.

In summary, I recommend concluding that none of the arguments raised by plaintiff in support of her argument that the ALJ's RFC was not supported by substantial evidence, has merit. Rather, I recommend concluding that the RFC is supported by substantial evidence in the record and that the ALJ did not err in relying on it in reaching his decision.

II. Magden's Lay Testimony

Plaintiff argues that the ALJ made three errors in rejecting Magden's lay testimony. Although lay witnesses are not competent to testify to medical diagnoses, they may testify as to a claimant's symptoms or how an impairment affects the claimant's ability to work. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). The ALJ may reject lay witness testimony "only by giving specific reasons germane to each witness[.]" Regennitter v. Commissioner, 166 F.3d 1294, 1298 (9th Cir. 1998).

48 - FINDINGS & RECOMMENDATION

First, plaintiff contends the ALJ erred in finding that Magden's testimony regarding plaintiff's problem with sitting for extended periods of time was contradicted by plaintiff's testimony indicating that sitting caused no increase in knee pain.

As noted above, plaintiff testified that she can sit, even when her knee hurts, if the knee is elevated.  Tr. 468.  She stated, "I don't really have much problems sitting I guess as far as my knee is concerned but I, when it's like just sitting regular the pain doesn't go away. . . . So that's why I have to elevate it."  Id.  A reasonable interpretation of this testimony is that sitting itself does not aggravate plaintiff's knee pain, but if that pain exists already, perhaps from having walked or stood too much, sitting will not aggravate the pain, but sitting with elevation of the knee will actually assist in dissipating the pain. Later, plaintiff separately described the effect of her ADHD on her ability to sit.

In contrast, Magden testified that plaintiff can sit for only fifteen or twenty minutes before "she's rotating."  Tr. 483.  He noted that she "rotates" positions every fifteen to thirty minute. Later, he mentioned that her ADHD has caused her problems.  Id.

The question posed to Magden which drew his response about plaintiff's sitting limitation did not ask him to distinguish between sitting limits caused by plaintiff's knee injury and those caused by plaintiff's ADHD.  Thus, his testimony is ambiguous. However, the fact that Magden later discussed the impact of plaintiff's ADHD indicates that the ALJ's interpretation that Magden's testimony reflected the limits on sitting caused by plaintiff's knee injury, is not unreasonable.  Truitt v. Barnhart,

49 - FINDINGS & RECOMMENDATION

No. 03-35861, 2005 WL 705392, at *3 (9th Cir. Mar. 29, 2005) (ALJ are to resolve ambiguities); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (it is the ALJ's responsibility to determine credibility and resolve conflicts and ambiguities in the medical and non-medical evidence; when the evidence is susceptible to more than one rational interpretation, and one is provided, the ALJ's conclusion must be upheld).

Next, plaintiff contends that because Magden testified that he saw plaintiff three or four times per week, the ALJ erred in rejecting Magden's testimony regarding the frequency of plaintiff's panic attacks on the basis that he no longer lived with plaintiff.

As the ALJ explained, Magden did not live with plaintiff at the time of the hearing and acknowledged not having lived with her since April 2003. Tr. 23. According to the Administrative Record, plaintiff first reported panic attacks to Dr. Frank in May 2003, after Magden moved out. Tr. 361-62. While Magden testified he sees plaintiff three or four times per week, there was no indication that he spent extended amounts of time with plaintiff or was in a position to observe plaintiff for any significant period of time. Thus, the ALJ did not err in rejecting Magden's testimony regarding the frequency of plaintiff's panic attacks as there is not a sufficient basis for the testimony being within the witness's personal knowledge.

Finally, plaintiff argues that the ALJ erred in concluding that Magden's testimony was of limited probative value because it was generally just a restatement of plaintiff's presentation and allegations. Plaintiff contends that Magden's testimony was specific and called for his direct observations of plaintiff's

50 - FINDINGS & RECOMMENDATION

limitations. According to plaintiff, it was not merely a recitation of what he may have heard from plaintiff.

Given that the ALJ articulated two supportable bases on which to reject Magden's testimony, I decline to address whether his finding that Magden's testimony was of limited probative value, was erroneous.

III. Improper Hypothetical

Plaintiff argues that the ALJ's hypothetical to the VE was incomplete because (1) it failed to set limits in the areas of reading and writing; and (2) it failed to address any limitations on pace.

As discussed earlier in regard to plaintiff's argument that the ALJ's RFC was improper because it failed to account for significant limits in her ability to read and write, the ALJ accepted plaintiff's allegation that she has limited reading and writing ability as being consistent with her long-term diagnosis of ADHD and that such limitations might affect her ability to perform tasks involving significant reading and writing. However, he explained, it did not appear that her basic functioning with regard to her ability to do simple tasks was significantly affected by these limitations.

Because, as discussed earlier, I recommend concluding that the ALJ's RFC was appropriate, and because the hypothetical included a limitation to simple routine tasks and instructions, I recommend concluding that the hypothetical posed to the VE did not erroneously omit a separate limitation on reading and writing. While the jobs identified by the VE require some reading and writing skills, they are unskilled jobs that do not appear to

51 - FINDINGS & RECOMMENDATION

require complex reading and writing skills.

As to the separate limitation regarding pace, plaintiff argues that the ALJ's limitation to simple routine tasks and instructions and only occasional contact with the public and coworkers, stems from the DDS psychologists' opinions that because of plaintiff's ADHD, she was mildly limited in social functioning and in maintaining concentration, persistence, and pace. Plaintiff argues that the ALJ's limitations in his hypothetical address plaintiff's deficits in social functioning, concentration, and persistence, but fail to address deficits in maintaining pace. Plaintiff contends this was error.

I agree with defendant, however, that first, the DDS psychologists' finding of a mild limitation in concentration, persistence, or pace is in the disjunctive and does not necessarily indicate a limitation in pace. Second, a mild limitation is considered to be non-severe, which in turn is defined as imposing no significant limitation on basic work activities. See 20 C.F.R. §§ 404.1520a(d)(1), 404.1521(a), 416.920a(d)(1), and 416.921(a). Therefore, I find no error here.

IV.  VE Testimony

Plaintiff contends that the ALJ erred by relying on the VE testimony that identified the two jobs as involving simple and routine tasks and instructions. Plaintiff argues that based on the descriptions of these jobs in the Dictionary of Occupational Titles (DOT), they require the performance of multiple tasks with multiple tools at different times of the workday and thus, are not jobs requiring simple and routine tasks and instructions.

The VE testified that the touch-up screener position was

52 - FINDINGS & RECOMMENDATION

unskilled and that the semiconductor assembler job was performed at an unskilled level even though the DOT classified it as low semi-skilled. Tr. 487. The VE explained that the semiconductor assembler position was last reviewed in 1986 and at that time, was rated as semiskilled with a specific vocational preparation level of 3. Id. But, the VE stated, a more recent Department of Labor publication from January 2002 indicated that the job could be learned consistent with entry-level, unskilled work, with a specific vocational preparation level of 2. Id.

The relevant regulations provide that unskilled work requires little or no judgment and entails simple duties. 20 C.F.R. §§ 404.1568(a), 416.968(a). The ALJ may rely on VE testimony that is contradictory to the DOT if the VE provides a reasonable explanation for the conflict between the VE's occupational evidence and the DOT. Soc. Sec. Ruling 00-4p (found at 2000 WL 1898704); see also Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995) (ALJ may rely on expert testimony that contradicts the DOT if the record contains persuasive evidence to support the deviation). The VE adequately explained the basis for his testimony. The ALJ properly relied on the VE's testimony.

V. Development of the Record

Plaintiff's final argument is that the ALJ failed to adequately develop the record. This argument, however, simply reprises arguments previously addressed. Plaintiff contends that the ALJ failed to develop the record by posing incomplete hypotheticals, by not inquiring further of various physicians in the record regarding plaintiff's limitations, and by failing to seek additional consultative examinations that would have clarified

issues raised to the ALJ.

For the reasons previously set forth, there was no ambiguity or inadequacy in the record triggering the ALJ's duty to further develop the record. I recommend that this argument be rejected.

CONCLUSION

I recommend that the Commissioner's decision be affirmed.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 9, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due June 23, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this  25th   day of  May        , 2005.


 /s/ Dennis James Hubel
_____
Dennis James Hubel
United States Magistrate Judge